# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **WALTER CASTRO** | **CIVIL ACTION** |
| **VERSUS** | **NO: 09-6806-AJM-SS** |
| **MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY** | |

## REPORT AND RECOMMENDATION

The plaintiff, Walter Castro ("Castro"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits and a period of disability under Title II of the Act, 42 U.S.C. § 423, and his claim for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382(a)(3).

## PROCEDURAL HISTORY

On October 22, 2007, Castro submitted applications for benefits. R. 96-106. He reported that he became disabled on April 19, 2007 from mental illness and an injury to his back. R. 96 and 159. On May 8, 2008, his claim was denied. R. 68-71. On October 15, 2008, there was a hearing before an Administrative Law Judge ("ALJ"). R. 23. On April 3, 2009, the ALJ issued an unfavorable decision. R. 9-22. On August 11, 2009, the Appeals Council denied his request for review. R. 1-4.

On October 16, 2009, Castro filed a complaint with this Court. Rec. doc. 1. The parties submitted cross-motions for summary judgment. Rec. doc. 14 and 17. The motion of Castro's counsel to withdraw was granted. Rec. doc. 20. Castro was notified that a report and

recommendation would not be issued for at least thirty days from September 8, 2010 to permit him to obtain counsel. Rec. doc. 20. No attorney enrolled for him.

After the ALJ denied his claim for benefits, Castro submitted another application for benefits and sought benefits from the day after the ALJ's decision. On June 2, 2009, the SSA office in Kenner reported that Castro met the medical requirements for disability benefits. The decision was based on a VA clinic report, dated April 30, 2009, and a report from Touro Infirmary, dated May 6, 2009. The SSA office reported that he became disabled because of manic depression, bipolar disorder and back injury. Rec. doc. 14 (Exhibit C). The decision of the Appeals Council contains the following:

> [T]he Appeals Council considered the fact that since the date of the Administrative Law Judge's decision, you were found to be under a disability beginning April 1, 2009, based on the application(s) you filed on April 14, 2009; however, the Council found that this information does not warrant a change in the Administrative Law Judge's decision.

R. 2. Castro contends that a July 23, 2009 MRI of the lumbar spine requires remand. He does not argue that the April 30, 2009 VA clinic report and the May 6, 2009 Touro report require remand and they are not part of the record.

## STATEMENT OF ISSUES ON APPEAL

Issue no. 1.      Does Castro's additional evidence require a remand?

Issue no. 2.      Did the ALJ give proper consideration to Castro's severe impairments, cervical disease and bipolar disorder, in determining his residual functional capacity?

## THE COMMISSIONER'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant to the issues on appeal:

1.      Castro met the insured status requirements of the Act through December 31, 2011.

2.      Castro did not engage in substantial gainful activity after April 19, 2007, the alleged onset

date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  Castro had the following conditions which are severe conditions within the constraints of
    <u>Stone v. Heckler</u>, 752 F.2d 1099 (5th Cir. 1985) & SSR 96-3p: cervical/lumbar disc disease,
    explosive personality disorder and major depression (20 C.F.R. 404.1521 *et seq.* and 416.921
    *et seq.*).

4.  Castro did not have an impairment or combination of impairments that met or medically
    equaled one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1 (20 C.F.R.
    404.1525, 404.1526, 416.925 and 416.926).  Specifically, Listings 1.04 Disorders of the
    spine, 12.04 Affective Disorders and 12.08 Personality Disorders are not met.

5.  Castro had the residual functional capacity to perform light work, as defined in 20 C.F.R.
    404.1567(b) and 416.967(b), except no more than occasional climbing of
    ladders/ropes/scaffolds, and no exposure to unprotected heights.  He was limited to simple,
    routine (1-2 step) and repetitive tasks.  He should perform a low stress job defined as having
    only occasional changes in work setting or decision making required.  He should have no
    more than superficial interaction with the public and co-workers.

6.  Castro was unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7.  Castro was a younger individual age 18-49 on the alleged onset date (20 C.F.R. 404.1563
    and 416.963).

8.  Castro had a limited education and was able to communicate in English (20 C.F.R. 404.1564
    and 416.964).

9.  Transferability of job skills was not an issue in this case because Castro's past relevant work
    was unskilled (20 C.F.R. 404.1568 and 416.968).

10. Considering Castro's age, education, work experience, and residual functional capacity,
    there were jobs that exist in significant numbers in the national economy that he could
    perform (20 C.F.R. 404.1569, 404.1569a, 416.969, and 416.969a).

11. Castro had not been under a disability, as defined in the Act, from April 19, 2007 or at
    anytime through at least the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

R.  11-21.

## ANALYSIS

a. **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Perez, 415 F.3d at 461. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues de novo or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show

that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Perez v. Barnhart, 415 F.3d at 461; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1]  The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry.  Id.  If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial

---

[1] The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520©, 416.920©.

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

gainful employment is available in the national economy, which the claimant is capable of performing.  Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989). When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant." Id.; accord Selders, 914 F.2d at 618.

"In determining whether substantial evidence of disability exists, this court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective medical evidence of pain and disability; and (4) the claimant's age, education, and work history." Perez v. Barnhart, 415 F.3d at 462.  "The Commissioner, rather than the courts, must resolve conflicts in the evidence." Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).

b.      **Testimony at the Hearing.**

At the time of the hearing Castro was 40 years old. R. 28.  He lived with his mother.  He was not married.  His wife had left him.  He had no relationship with his children.  R. 32.  He had been a special education student.  He went up to the twelfth grade but did not complete it.  R. 28.  He could read at the fifth grade level.  R. 40.  He described his math as horrible.  R. 40.  He could not buy something and be sure he received the right change.  R. 40.

After three years in the Navy, he received an administrative discharge.  R. 29 and 41.  He struck a superior officer.  R. 29-30. He worked at a Shell chemical plant on Airline Highway as an industrial cleaner.  R. 48.  He struck his supervisor after he was given a direct order.  He was discharged for insubordination and banned from the facility.  R. 39 and 47.  He did janitorial work for several companies, including Bally's Casino.  R. 41-42.  At Bally's he picked up garbage, cleaned machines and mopped the floor.  The heaviest thing he lifted was a bucket of water.  R. 48. He also worked for a temporary labor company.  R. 42.  He had worked in garbage disposal for

several companies, r. 41, as a truck driver and picking up both cans and dumpsters.  R. 43.  He stopped working in April 2007 after an accident.  R. 41.  In the ten years before the hearing he held about thirty jobs.  R. 37.  Each job lasted about three months before he was fired.  R. 37.  He held no job for more than six months.  R. 37.

In April 2007, he was injured when the forklift on a garbage truck picked up a dumpster and a can acid spilled on him.  R. 43.  He was operating a front-end loader truck when the accident occurred.  R. 44.  The forks jammed.  He climbed to the top of the truck and the dumpster struck him.  R. 44.  The whole dumpster fell off the forklift.  R. 52.  At another point in the hearing he testified that he was on the ground when the dumpster fell.  R. 52-53.

Castro did not do anything during the day.  He lay in bed and cried.  R. 31.  His mother did all the chores, including cooking, and cutting the grass.  R. 31.  He was too depressed to do any chores.  R. 32.  He did not go to church.  R. 33.  He did not do any shopping.  R. 33.  His mother supported him.  R. 39.  He did not receive worker's compensation benefits.  R. 40.  He had a lawsuit for such benefits.  R. 40.  His relationship with his mother was respectable.  R. 32.  He had no relationship with his children.  R. 32.  He did not get along with other family members.  R. 32.  He had no friends.  R. 33.  He had no hobbies, and he did not watch TV.  R. 52.  He had no interest in watching TV at all.  R. 52-53.  He did not drink alcohol or take illegal drugs.  R. 52.

Castro injured his back, neck, shoulder, and wrist in the April 2007 accident.  R. 28, 30 and 46.  His most severe problem concerned his back and neck.  R. 45.  When he sat for prolonged periods, he was in severe pain.  R. 28.  His back and neck hurt a lot and he was on Vicodin.  R. 45.  His shoulder was in bad shape.  R. 28.  The problems with his shoulder related to his back pain.  R. 46.  He felt pain where the dumpster hit him.  R. 46.  His wrist was in bad shape.  R. 28.  Because

of the injury to his wrist, he could not hold an object in his left hand for long periods of time.  R. 36 and 46-47.  He had pain in his wrists from cellulitis.  R. 30.  He had problems writing or typing because of cellulitis.  R. 36.

He had an injury to his knee.  R. 28.  He had to elevate his legs every so often to prevent swelling in his knees.  R. 36-37 and 46.  He could not stand for more than one to two hours before his knees began swelling.  R. 46.

Castro suffered from depression and volatile suicidal tendencies.  R. 28 and 47.  He did not pay attention to detailed instructions.  As a result, his managers insulted him.  He reacted in a volatile manner.  R. 48.  He was hospitalized at Touro, the Veterans Administration ("VA") hospital and the Biloxi Air Force base for mental illness.  R. 29-30.  He was treated for depression while he was in the military.  R. 30.  The mental health treatment worked a little.  R. 38.  He was arrested for domestic abuse.  His mother had him arrested for a violent act against his sister.  R. 39.

Castro was on a lot of medication including Vicodin, Xanax and Prozac.  R. 30.  The medication helped a little.  R. 30.  The side effects included light headedness, dizziness, dry mouth and lethargy.  R. 30-31.

He could not carry more than eight to nine pounds occasionally.  R. 34.  He could carry less than eight to seven pounds frequently.  R. 34.  He could not lift anything heavy.  R. 34.  He could walk about half a block.  R. 34.  He could not sit for more than fifteen minutes without having to stand.  R. 34.  He could stand about half an hour before he had to sit down.  R. 35.  He had problems stooping, pushing and pulling.  R. 35-36.  As a garbage worker, the most he lifted was thirty to forty pounds.  R. 43.

The ALJ noted that the consulting examiner reported that he was uncooperative.  Castro

8

responded that: (a) the doctor wanted him to squat and do a duck walk; (b) he told the doctor that he was in too much pain to do it, and (c) he was not uncooperative. R. 49. The ALJ noted a report from the VA hospital that Castro was not able to start physical therapy because he was incarcerated. He responded that when he hit his sister, his mother had him arrested. R. 50. The ALJ noted that in April 2007 the medical records reported that Castro did not keep an appointment, the clinic called him, and he responded that he was on another mission. He explained that he made several suicide attempts and he said off the wall stuff. R. 50-51. The ALJ reported that there was a note in a VA medical record that Castro was fired from a job as a result of a fall. He responded that he was fired as a result of the dumpster incident. His employer thought he was reckless. R. 51.

The vocational expert classified Castro's past work as a garbage collector as unskilled and very heavy. R. 55. If Castro's residual functional capacity was restricted to light duty, he could not return to his past relevant work. R. 57. There were jobs available that could be performed with a residual functional capacity at light or sedentary levels. R. 58.

**c**.      **Medical Evidence**.

### 1991

The VA records contain a November 19, 1991 consultation report by Thomas Gilbride, Ph.D., a clinical psychologist. R. 231-235 and 370-373. The history provided by Castro indicates that he joined the Navy when he was almost twenty years old. He was stationed in California on a vessel. When his wife became pregnant with their second child, he transferred to New Orleans so that his wife's family could help with the care of the children. On December 15, 1990, he had been in a motor vehicle accident. After the accident he had severe pain in his back. His supervisor was not considerate of his injuries and made him do work like pick up garbage. He began missing work

and noticed that his judgment was impaired, for example he cursed people without reason.  He was placed in Joe Ellen Smith Hospital where he received tranquilizers and antidepressants.  In January 1991, he was placed in the brig in Pensacola for two weeks for missing work.  He was in isolated confinement and attempted suicide.  He returned to Joe Ellen Smith for three weeks for a mental disorder.  After his release he was transferred to Kessler.  In late March 1991, he was required to leave the Navy with a less than honorable discharge.  Since his separation from the Navy, he had not worked.  He was depressed; he gained weight; he spent his time watching TV; he separated from his wife; and he lived with his mother.  He denied any drug or alcohol problems.  He was diagnosed with major depression, recurrent and severe.  He was described as having a dependent personality disorder with passive/aggressive features.  R. 373.

### 1992-1993

On January 27, 1992, Castro was seen by Nathan Miss, M.S., a clinical psychologist intern, who reported to him on his psychological evaluation.  R. 244.  He was seen again on February 14, 1991.  R. 237-238.  He returned on March 10, 1992.  He reported that: (1) he sought review of the less than honorable discharge; (2) he felt something was wrong since his accident; and (3) he felt somewhat depressed.  He had not supplied the VA with his Joe Ellen Smith Hospital records.  R. 239.  He returned on April 21, 1992.  He remained at his mother's house where he felt as though he was being taken care of.  R. 241.  He failed to appear for appointments on May 20, June 15, July 2, and August 9, 1992.  He cancelled an appointment on June 9, 1992.  R. 241, 365 and 368-369.

On September 30, 1992, a coroner's emergency certificate was completed.  Castro was not taking his medication and he had made homicidal threats.  R. 333.  There are no records for 1993.

### 1994

On March 15, 1994, Castro sought treatment from the VA hospital for a laceration of the left lateral wrist.  He reported that he was opening a can and the lid cut him.  R. 229.  On July 27, 1994, Diane Castro, the sister of the claimant, reported that he was not taking his medication and was making homicidal threats to a friend.  An order for protective custody was signed and he was taken to the VA hospital.  R. 335.  He was admitted to the inpatient psychiatric service for observation and evaluation.  His physical condition was stable.  His course in the hospital was excellent.  He was cooperative and demonstrated no difficulty with impulse control.  There were no signs of active psychosis.  He was discharged on August 1, 1994 to return home and to his job.  R. 311-312.

### 1995

On March 17, 1995, Castro sought treatment for a fungal finger nail infection.  R. 227.  On April 12, 1995, he was seen for the problem with his left thumb nail.  R. 253.  On May 11, 1995, he failed to appear for an appointment concerning his thumb nail.  R. 252.  On June 1, 1995, it was removed.  R. 251.  He failed to appear for five follow-up appointments.  R. 246-250.

### 1996

On March 6, 1996, he was seen at the VA hospital.  He reported that he was separated from his wife, he was depressed, he had little appetite, he was unable to concentrate on his studies, he was on medication, and he denied alcohol or street drug use.  R. 357.  On March 9, 1996, he requested that he be admitted.  He reported that he was not able to do his job well.  R. 265.  He denied suicidal ideation.  He reported depression from disputes with his wife.  R. 271-272 and 277.  On March 10, 1996, he requested that he be released.  R. 267.  He sought medication to control his nerves.  He was alert and responsive, and his affect and mood were appropriate.  R. 278 and 279.  On April 2, 1996, he reported an overdose of antidepressants.  R. 496.  He reported that he was not trying to kill

himself.  He only wanted to sleep. R. 497.

**1997-2001**

There are no records for 1997.  There is a VA record where he reported that he was discharged from the Joe Ellen Smith psychiatric unit about two months before.  He sought a prescription for his panic disorder.  He also wanted disability as result of this condition.  This record may be dated May 28, 1998.  R. 228.  There are no other records for 1998 through 2001.

**2002-2006**

On August 1, 2002, Castro went to the VA emergency room after he swallowed some gasoline by accident a few days earlier.  R. 438-439.  On October 15, 2002, he went to the VA mental health unit and requested Xanax, he refused other antidepressants, and left when his request for Xanax was denied.  He reported that he became depressed when his wife left him.  R. 435-437.  There are no records for 2003.

On July 27, 2004, he went to the VA and reported little interest in doing things.  He felt down, depressed and hopeless.  R. 432-433.  His physical exam was normal.  R. 434.  A chest x-ray revealed no evidence of acute cardiopulmonary disease.  R. 381-383. There was an unremarkable lumbar spine series.  R. 382.

On July 4, 2005, he went to the VA and reported that he tripped and fell while helping a friend paint a house.  He hit his face and fractured one of his teeth.  He complained of pain in the right side of his face.  R. 428.  He was referred to a dentist.  R. 429.  On July 12, 2005, an oral surgeon extracted the root of the tooth.  R. 422-423.  There are no records for 2006.

**2007-2008**

On April 17, 2007, Castro fell from a truck.  He reported pain in his left wrist, lower back and neck.  He reported that a garbage can was not fixed properly and it fell and caused him to fall on his back.  R. 547.  On April 22, 2007, he went to the River Parishes Hospital.  He complained that a liquid spilled onto his left arm in the accident.  He reported persistent pain in the left arm and swelling.  R. 452.  Tenderness was noted in his neck and low back.  R. 454.  The diagnosis was acute myofascial strain in the lumbar region, degenerative disc disease and chemical burns on his left arm.  Medication was prescribed.  R. 454.  On April 24, 2007, he went to the VA hospital.  He reported that he was fired as a result of the accident.  A mental health appointment was scheduled.  R. 421.  He complained of pain in the left wrist.  It was bruised and appeared to be healing.  R. 420.  On April 25, 2007, he returned to River Parishes Hospital for the skin condition on his left arm.  He reported pain at a level of nine on a ten-point scale.  R. 448.  The diagnosis was cellulitis.  R. 450.  On April 25, 2007, Craig Maumus, M.D., a psychiatrist at the VA hospital, noted that Castro did not show for an appointment.  Castro reported that he did not want to come in because he was "on another mission."  R. 419.  On April 26, 2007, Castro returned to the VA hospital for treatment of his skin condition.  He reported that it was difficult to lift garbage cans because of his left arm pain.  He was told to remain off of work for ten days.  R. 415-416.

On May 3, 2007, he was seen at the VA hospital for pain management.  He reported that the current level of pain in left shoulder and neck was not acceptable.  R. 410 and 540-541.  A physical exam demonstrated slight cervical musculature tightness and tenderness, there was good cervical range of motion, limited cervical extension secondary to pain, and limited range of motion with lumbar flexion secondary to pain.  R. 409.  He reported that he was taking the prescribed medication.

13

R. 413.  The examination revealed that his left forearm was healing well.  The abscess and cellulitis

was healing.  He was diagnosed with a muscle strain.  He was to return in six weeks.  R. 411.  May

4, 2007 CT scans revealed some bony spurring in the lower cervical spine consistent with mild

degenerative changes, narrowing at the L4-5 and L5-S1 disc space, and no fracture or dislocation

of the left shoulder.  R. 379-381.  On May 18, 2007, Castro failed to appear for an appointment with

Dr. Maumus.  R. 539.

On June 4, 2007, there was a physical examination.  Castro's description of the pain was

vague.  The findings included normal gait, good cervical range of motion, slight cervical

musculature tightness and tenderness, limited cervical extension secondary to pain, limited range

of motion with lumber flexion secondary to pain, and intact reflexes.  R. 397.  The exam was noted

as inconsistent.  R. 397-398.  On June 5, 2007, physical therapy was recommended for the neck and

back pain.  R. 410.  On August 16, 2007, he was seen at the rehabilitation clinic.  R. 535.  He was

instructed to consult with physical therapy, Naprosyn was prescribed, and he was to return in three

months.  R. 536.

On October 29, 2007, Castro was seen by Dr. Maumus.  R. 533.  He reported that he had

been depressed as far back as he could remember.  He did not know how he responded to

medication.  He did not like to take medication but believed that he needed something.  He had

crying spells every hour.  He slept poorly.  He did not want to get out of bed.  He was diagnosed

with possible major depressive disorder.  R. 404.  He was to return in three to four weeks.  R. 404.

A call was made to Castro to remind him of an appointment with Dr. Maumus on November 19,

2007 (R. 403), but he did not keep it.

On December 8, 2007, Castro was seen by Elizabeth Skeins, M.D.[2] for a consultative examination.  His chief complaint was low back pain.  He reported that the pain began after the April  17, 2007 accident. It radiated into both of his legs and his upper back.  He made minimal efforts during the examination.  The diagnosis was low back pain.  Because he refused or would not attempt several parts of the exam, the doctor was unable to fully evaluate functionality.  R. 458-461.

On January 8, 2008, Castro was seen at the VA hospital by Dr. Usha Mandhare, a primary care physician, who reported that on May 3, 2007 he ordered physical therapy and non-steroidal anti-inflammatory drugs for muscle strain, but Castro was not consistent with the physical therapy. He was restarting it on January 24, 2008.  Because of his complaints of back pain, Dr. Mandhare recommended that he not lift more than 20 pounds while going through therapy.  R. 403.  He was diagnosed with depression and told to return to the mental health clinic.  He was told to find a new vocation which he could perform.  He was to return in two months.  R. 402.  Castro did not appear for the physical therapy evaluation on January 24, 2008.  R. 400.

On January 22, 2008, Castro was seen by Dr. Minati Biswas, a psychiatrist, for a consultative examination.  The diagnosis included major depressive order, recurrent, severe, with psychotic features.  It was recommended that he follow up with Dr. Maumus, take his medication and complete the physical therapy.  R. 464-466.

Castro did not appear for a mental health consult on February 4, 2008.  R. 394.  On February 21, 2008, he was seen by Dr. Minh Nguyet Tran with complaints of pain in the back and neck.  He was to return in two months.  R. 526-527.  He did not appear for a physical therapy evaluation on February 27, 2008.  R. 526.  On March 28, 2008, he was instructed on how to use a TENS unit.  No

---

[2]  The record does not disclose Dr. Skeins' speciality.

further physical therapy was indicated at that time.  R. 525.

On July 28, 2008, Castro was seen by Dr. Maumus, who noted that he had not seen him since October 29, 2007.  Castro reported that he had transportation problems in returning to Dr. Maumus. The impression was likely major depressive disorder.  Dr. Maumus questioned his reliability in providing information.  R. 523-524.

On August 14, 2008, Castro was seen by a primary care physician, Dr. Gordon Clark, who prescribed Naprosyn and Hyrocodone for the right knee pain with a work excuse for three days and Lotrimin cream for his skin condition.  R. 516-518.  On September 24, 2008, a nurse contacted Castro by phone to follow-up on his depression.  He reported that: (1) it was not well-controlled; (2) his mood was low, he lacked motivation and he experienced sadness; (3) he took his antidepressants but they were not doing him any good; and (4) his sleep cycle was off even after taking Trazodone. It was suggested that he schedule an appointment.  R. 515.  On September 24, 2008, the nurse made multiple unsuccessful attempts to contact Castro by phone for follow-up management of his depression.  R. 515.

**d**.     **Plaintiff's Appeal**.

**Issue no. 1.**     Does Castro's additional evidence require a remand?

Castro's additional evidence consists of a July 16, 2009 ultra sound of the abdomen and a July 23, 2009 MRI of the lumbar spine.  Rec. doc. 14 at 2 and (Exhibit A).  The ultra sound revealed a minor abnormality.  The MRI revealed: (1) a bulging disc at L4-5 with mild protrusions and mild narrowing of the left foramen; (2) degenerative changes at L5-S1 with bulging disc and protrusion; and (3) the possibility of a renal cyst.  Castro argues that the MRI demonstrates that his lumbar spine condition is more serious than the ALJ determined.  He urges that the lumbar condition and the

16

evidence of a lesion on his kidney must be reflected in the assessment of his residual functional capacity ("RFC").  The Commissioner contends that the MRI does not relate to Castro's condition during the time period for which benefits were denied.  Rec. doc. 17 at 6-7.

A claimant's motion to remand is to be granted "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. . . ."[3]  42 U.S.C. § 405(g).  The evidence must be:  (1) new and not cumulative; (2) material; and (3) good cause must be shown for the failure to incorporate such evidence into the record in a prior proceeding.  Pierre v. Sullivan, 884 F.2d 799, 803 (5th Cir. 1989).

The relevant time period for Castro's claim is from April 19, 2007, the alleged onset date, to April 3, 2009, the date of the ALJ's decision.  The MRI and ultrasound fail to meet the materiality requirement for remand because they do not relate to Castro's condition during the time period for which benefits were denied.  Implicit in the materiality requirement is that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition.  Johnson v. Heckler, 767 F.2d 180, 183 (5th Cir. 1985).  At most the MRI demonstrates subsequent deterioration of a condition which the ALJ found was non-disabling.

**Issue no. 2.**   Did the ALJ give proper consideration to Castro's severe impairments, bipolar disorder and cervical disease, in determining his residual functional capacity?

Castro argues that although Dr. Biswas diagnosed him with bipolar disorder, the ALJ failed to give any functional limitations for this impairment.  The Commissioner responds that the ALJ fully considered Dr. Biswas' report in formulating Castro's residual functional capacity ("RFC").  The ALJ stated that:

---

[3]  On June 9, 1980, partly in an effort to stem the growing tide of unjustified federal court ordered remands, Congress amended 42 U.S.C. § 405(g).  The relaxed "good cause" standard for remand of disability benefit cases was replaced.  Dorsey v. Heckler, 702. F.2d 597, 604 (5th Cir. 1983).

I assign little weigh to the opinions and conclusions of Dr. Biswas, which are not based upon any review of longitudinal history – only subjective complaints taken as truths. The presentation in regard to pressured speech and severe weakness in memory/concentration are not supported by other medical evidence. There were never any prior complaints of severe memory/attentional weaknesses. Mental status examinations found claimant's memory and concentration to be intact, and did not note pressured speech. I concur with Dr. Biswas's finding that he has impulse control disorder. I do not concur in her impressions of bipolar disorder and chronic pain.

R. 14.

On January 22, 2008, Castro was seen by Dr. Biswas for forty minutes. His mother came with him for the evaluation. Both of them provided information to Dr. Biswas. The opinions and conclusions of Dr. Biswas were not based upon a longitudinal history and she accepted Castro's subjective complaints. R. 464-466.

The medical records reveal that Castro went to the VA on July 27, 2004 and reported that he was depressed. R. 432-433. There are no further reports of depression until April 24, 2007, about a week after the accident when he fell and a substance spilled on his arm. At that time a mental health appointment was scheduled. R. 421. Castro, however, did not appear for the appointment with the psychiatrist, Dr. Maumus. R. 419. On May 18, 2007, he missed another appointment with Dr. Maumus. R. 539. On October 29, 2007, Dr. Maumus diagnosed likely major depressive disorder. He questioned Castro's reliability with information. His diagnosis did not include bipolar affective disorder. R. 404. Although a call was placed to remind Castro of his November 19, 2007 appointment with Dr. Maumus, he failed to keep it. R. 403. On January 8, 2008, Castro reported depression to his primary care physician who told him to return to the mental health clinic. R. 402. Although Dr. Biswas recommended that Castro participate in therapy (R. 466), he did not show up for an orientation group therapy session with the VA mental health unit.

R. 294.  On July 28, 2008, he returned to Dr. Maumus.  The report was similar to the October 29,

2007 report.  There was no diagnosis of bipolar affective disorder.  Dr. Maumus again questioned

Castro's reliability in providing information.  R. 523.  On September 24, 2008, a nurse contacted

Castro by phone to follow-up on his depression.  He reported that it was not well-controlled.  The

nurse suggested that he schedule an appointment with Dr. Maumus.  R. 515.  There is no record that

he did so.  The VA records do not reveal any complaints by Castro of severe memory or attention

weaknesses.   The mental status examinations by Dr. Maumus found Castro's memory and

concentration to be intact.  They did not note pressured speech.  R. 404 and 523.

The ALJ is free to reject the opinion of any physician when the evidence supports a contrary

conclusion.  Martinez v. Chater, 64 F.3d 172, 176 (5th Cir. 1995) (citing Bradley v. Bowen, 809 F.2d

1054, 1057 (5th Cir. 1987)).  The VA medical evidence supports a conclusion contrary to the opinion

by Dr. Biswas.

Castro contends that although the ALJ found that he had severe cervical disc disease, he

failed to give any functional limitations for this impairment.  He argues that: (1) the VA records

reveal that he consistently complained of neck pain; (2) he was issued a TENS unity for the pain;

and (3) the May 4, 2007 x-rays revealed mild degenerative changes in the cervical spine.  The ALJ

found that:  (1) Castro's cervical/lumbar disc disease was a severe condition (R. 12); (2) he could

perform light work and he was limited to simple, routine (1-2 step) and repetitive tasks (R. 16); (3)

his statements concerning the intensity, persistence and limiting effects of his symptoms were not

credible (R. 17).  He was described as having "very poor credibility."  R. 17.  The findings on

credibility were documented at length.  R. 17-19.

The only x-ray of the cervical spine for the relevant period revealed some bony spurring in

the lower cervical spine consistent with mild degenerative changes.  R. 379.  On June 4, 2007, a physical examination found slight tightness and tenderness in the cervical muscles, a good cervical range of motion with rotation and flexion, and limited cervical extension secondary to pain.  He was referred to physical therapy for the neck pain.  R. 397-98.  On December 8, 2007, he was examined by Dr. Skeins.  She reported that Castro would not attempt several parts of the exam, so she was unable to fully evaluate functionality.  She diagnosed only chronic law back pain.  He did not report cervical pain.  R. 459-461.  On January 8, 2008, he was seen by his primary care physician at the VA.  He did not report any neck pain.  He was seen for low back pain and cellulitis.  R. 403.  On January 22, 2008, Dr. Biswas recorded his chief complaints as depression and back problems.  There were no reports of neck pain.  R. 464.

On February 21, 2008, he reported neck and back pain.  The results of the physical exam for the neck were the same as those on June 4, 2007.  R. 397-398 and 526-527.  On August 14, 2008, Castro was seen by a VA primary care physician.  Castro reported that he injured his right knee at work.  He complained of pain and swelling.  He did not report neck or back pain.  He was given a work excuse for three days.  R. 518-519.[4]

Castro contends that his RFC should have been restricted to occasional head/neck movements and he should not have been permitted to perform overhead work because of his neck impairments.  The medical records do not support such limitations.  There were significant periods following the April 17, 2007 accident where he did not report neck pain.  Most recently in August 2008, he did not report neck pain.  Instead he complained of knee pain from a work injury.  This was during the period when Castro contended that he was unable to work.  There is substantial evidence

---

[4] It is unclear what employment is being referred to.

20

to support the ALJ's finding on Castro's credibility.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that defendant's cross-motion for summary judgment (Rec. doc. 17) be GRANTED and plaintiff's motion for summary judgment (Rec. doc. 14) be DENIED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 3rd day of December, 2010.

**SALLY SHUSHAN**
**United States Magistrate Judge**